(No. 19360.—

THE COAL CREEK DRAINAGE AND LEVEE DISTRICT, Defendant in Error, *vs.* THE SANITARY DISTRICT OF CHICAGO, Plaintiff in Error.

*Opinion filed June 19, 1929—Rehearing denied October 5, 1929.*

12

FARMER, C. J., dissenting.

MACLAY HOYNE, W. H. DIETERICH, JOHN W. BECK-WITH, and WALTER E. BEEBE, for plaintiff in error.

THOMAS E. BOTTENBERG, and BARNES & MAGOON, for defendant in error.

Mr. JUSTICE HEARD delivered the opinion of the court:

This cause is here on *certiorari* to review a judgment of the Appellate Court for the Third District affirming a judgment of the circuit court of Schuyler county in favor of defendant in error, against plaintiff in error, in the sum of $98,089.62, damages resulting from an alleged unlawful overflowing of the property of defendant in error. The trial court, upon a hearing, fixed the sum of $15,000 as reasonable attorneys' fees for defendant in error to be taxed as costs, and also an additional fee of $5000 in the event the case should be appealed.

This suit was brought under section 19 of "An act to create sanitary districts and to remove obstructions in the Des Plaines and Illinois rivers," in force July 1, 1889, which provides that every sanitary district shall be liable for all damage to real estate within or without such district which shall be overflowed or otherwise damaged by reason of the construction, enlargement or use of any channel, ditch, drain, outlet or other improvement under the act, and provides that action to recover damages may be brought in the county where such real estate is situated or in the county where such sanitary district is located, at the option of the party claiming to be injured. Said section further provides that upon notification of the trustees, before suit is commenced, of intention to sue, in case judgment is rendered against such district the plaintiff shall recover his reasonable attorneys' fees.

The declaration originally consisted of two counts. A demurrer to a plea was carried back and sustained to the

first count and plaintiff abided by the count. The second count of the declaration is in substance as follows: That the said defendant from the first day of January, 1921, until the date of the commencement of this suit, willfully, recklessly, unlawfully, improperly and without any authority of law, by discharging waters from a certain sanitary district channel owned and operated by it into the Illinois river, did overflow, flood, injure, break down, wash away and destroy the levees, dikes, pumping station, ditches and tile drains of the plaintiff, a drainage district duly organized under the laws of the State of Illinois, and which were located in the county of Schuyler, and did thereby hinder and prevent plaintiff from having the use, benefit and enjoyment thereof in so large and ample a manner as it might and otherwise would have done, and did put plaintiff to great cost and expense in the repair, rebuilding and reconstruction of the same, to-wit, the sum of $250,000.

By leave of court an additional count was filed, which, after being amended, alleged, in substance, the organization of plaintiff as a drainage and levee district by the order of the county court of Schuyler county, entered on the 28th day of December, 1896; that after said organization it acquired certain rights of way for the purpose of constructing the works of said drainage district thereon and from thence hitherto has been the owner and in possession of said rights of way; that afterwards, in the year 1897, and at divers times subsequent thereto and prior to the commencement of this suit, plaintiff constructed its levees, interior open ditches, tile drains, pumping station, dwelling house, buildings and other works on the rights of way. It alleged the organization of defendant, the Sanitary District of Chicago, the construction of its dams, canals and channels, and that on January 17, 1900, defendant turned therein the waters from Lake Michigan, the Chicago river and the watersheds adjacent thereto, and the sewage from

the district, and caused the same to flow into the Illinois river above the plaintiff district; that said waters increased in quantity during each succeeding year, and defendant constructed controlling works by which it could regulate and control the amount of water and sewage flowing through the canal into the Illinois river; that by the act of the legislature authority was granted to defendant to flow and discharge waters from Lake Michigan and from said district through the drainage canal and thence by divers channels and water-courses into the Illinois river, and that the amount of said flowage was to be based upon the number of people' resident within the district; that there was required to be a steady, uniform flowage based upon said population, with the right and authority to increase the same as the population increased; that up to a period ending five years prior to the commencement of this suit, the population of the sanitary district was not to exceed 2,400,000 people, and that, based thereon and thereunder, the sanitary district was authorized to discharge, and did discharge, through the drainage canal a large quantity of water, to-wit, 480,000 cubic feet per minute, which flow of water plaintiff avers was ample at all times to properly dilute the sewage of said district and to keep and maintain the waters of the canal so that the same should be neither offensive nor injurious to the health of any of the people of this State; that with the period beginning five years prior to the commencement of this suit, defendant, not regarding said statute, willfully, wrongfully, improperly and unlawfully, and for the purpose not only of carrying away and diluting the sewage of the city of Chicago and the area within the sanitary district, but also in part for the purpose of generating electrical power for the use, profit and benefit of the sanitary district, did discharge through the sanitary district canal a much greater flow and quantity of water from Lake Michigan and from said district through the Chicago river, and also through the sanitary district canal,

than was necessary or required for the purposes of said act or authorized or permitted by it,—that is to say, to keep the water of the district in such condition that the same should be neither offensive nor injurious to the health of any of the people of the State of Illinois, and vastly in excess of the amount and quantity which it was authorized and permitted to flow by and under the laws of the State of Illinois; that defendant during said period of five years prior to the commencement of this suit so discharged not less than the quantity of 1,400,000 cubic feet per minute of water from Lake Michigan and from the sanitary district through the Chicago river, and also through the sanitary district channel, at various times and periods during the five years immediately prior to the commencement of this suit; that particularly in times of flood in and upon the Illinois river, when the waters thereof were swollen and filled the natural channel of the stream to its full capacity and overflowed the same, defendant willfully, wrongfully, unlawfully and without any authority of law discharged all of the waters from Lake Michigan and from the sanitary district through the Chicago river and other channels into the Illinois river that could be sent by it through the channel of the drainage canal, and that at times the flow of water in said channel amounted to 1,600,000 cubic feet per minute, which respective flows of the sanitary district, as above set forth and averred, exceeded the flow thereof prior to the commencement of the five-year period prior to the commencement of this suit by a large amount, to-wit, the respective quantities as above set forth per minute more than had been theretofore flowed through the canal and channel during the period from the commencement of the flow through the channel and ending with the period five years prior to the commencement of this suit; that during said period of five years prior to the commencement of this suit, wholly without right or authority, it has continued continuously and unlawfully to discharge said

quantity of water wrongfully and in disregard of the rights of those persons owning property adjacent to the Illinois river, and particularly in disregard of the rights and property of the plaintiff herein; that the effect of said excessive discharge was to raise the level of the Illinois river in times of flood and high water in the river to a greater height than it otherwise would have been raised, to-wit, to the height of three feet, and in times of low water was to raise the level of the water in said river to a greater height than it would otherwise have been raised, to-wit, to the height of six feet above the stage of water in the Illinois river, had the same been confined to the natural flow of water in the Illinois river and the authorized flow of defendant herein as the same had been flowing for a period prior to five years before the commencement of this suit; that prior to the five years before the commencement of this suit the lands of plaintiff within the drainage district had not been overflowed or flooded since the date of the construction of the drainage district by the water of the Illinois river adjacent thereto nor had its dikes and levees been overflowed or destroyed; that from and after a period beginning five years prior to the commencement of this suit, solely and entirely by reason of the unlawful flow and discharge from the defendant herein in excess of the amount which it might lawfully discharge into the Illinois river as is above set forth, the level of the Illinois river adjacent to the drainage district was so raised and elevated that the river on the 16th day of April, 1922, and on divers other days during said period, overflowed the levees and dikes, flooded the district, broke, tore down, injured and destroyed the levees and dikes, flooded and destroyed the crops and agricultural operations of the owners of lands in the district, rendered the lands therein wet, untillable, sour and unfitted for agricultural purposes, and thereby rendered the works of plaintiff useless for the purposes for which they were constructed and destroyed and injured the pumping station,

ditches and other works of plaintiff therein located; that by reason of said flood it was impossible to pump the water from the drainage district, and that it became necessary for plaintiff to reconstruct, repair and re-build its dikes and levees, to repair and remodel its pumping station, and to expend large sums of money for such purposes in order to again fit the district for use of husbandry and for agricultural purposes; that while the repairs of the dikes, levees and pumping station were being made, the waters of the Illinois river stood in and upon the lands embraced in the district for long periods of time, making the district wholly and entirely worthless and unprofitable; that by reason of the wrongful and unlawful discharge of water from the sanitary district as is above set forth, and the consequent maintaining of the increased level of the Illinois river, it has become necessary to raise the height of the levees and dikes and to strengthen the same, and has increased the seepage from the river through the levees and dikes into the district, and has thereby greatly increased the cost of pumping the water from the district. The *ad damnum* is fixed at $250,000.

After various proceedings in reference to the pleadings and hearings in the trial court on demurrers the case went to trial upon the above declaration with a plea of the general issue, a plea denying ownership of the lands, which was afterwards abandoned, (*Coal Creek Drainage District v. Sanitary District of Chicago,* 328 Ill. 360,) general and special pleas of the Statute of Limitations, and replications to the various pleas.

Defendant was organized under the provisions of "An act to create sanitary districts and to remove obstructions in the Des Plaines and Illinois rivers," approved May 29, 1889, in force July 1, 1889, by an election duly called under section 1 of said act. The controlling works of defendant consist of a bear-trap dam 160 feet long, with a gate about 10 feet high, which could be operated by power,

opening and closing the same in a very few minutes. This dam has a maximum flowage capacity of water of 460,000 cubic feet per minute with a 6-foot head and 800,000 cubic feet with an 8-foot head. In 1907 defendant extended its channels and constructed a 48-foot and a 12-foot dam, with gates similar to and operated in the same manner as the bear-trap dam. Seven sluice gates and seven turbine wheels were installed for the purpose of creating power to generate electricity. The maximum flowage capacity of the 12-foot dam was 100,000 cubic feet per minute and of the 48-foot dam 400,000 cubic feet. Each of the seven sluice gates had a flowage capacity of 400,000 cubic feet per minute and the seven turbine wheels a capacity of 700,000 cubic feet. The total maximum flowage capacity of the controlling works is 2,280,000 cubic feet per minute. There was constructed a spillway or dam on the side of the canal at such height that when the water in the Des Plaines river reached a certain elevation it would spill from that river into the canal, and a rainfall in the watershed of the Chicago river sufficient to produce a current into Lake Michigan will produce a rise in the Des Plaines river.

The canal and the controlling works of defendant were completed and the water and sewage permitted to flow into the canal on January 17, 1900, at which time the waters of the Chicago river and its watershed were diverted and caused to flow into the Illinois river. Afterwards an extension of some two miles was constructed at the lower end of the canal and a power plant built for the purpose of converting the water power made available into electrical energy. The machines generating the electrical current were driven by turbine water-wheels installed in pits, there being seven pits at the end of the canal. In addition to the turbines there were constructed at the lower end of this extension a 48-foot dam and a 12-foot dam operating on the same principle as the bear-trap dam. At high water the waters of the Des Plaines river spilled into the canal

of defendant, and the controlling works were used to prevent the Chicago river from flowing into Lake Michigan and the water from the spillway was used for the purpose of starting and aiding the current from the canal toward the Illinois river and away from Lake Michigan. The Des Plaines river itself flows into the tail-race of the power plant of the defendant, and the water taken from the tail-race is caused to flow through the turbines to aid the production of electrical power. During flood periods a portion of the Sag channel, owned by defendant, also discharged water into the main channel, and this water was used by it for dilution and power purposes. During March and April, 1922, a depression known as the Sag channel, serving an area of some seventy or eighty square miles in extent, drained into the main canal of defendant some ten miles below the boundary of the district and above the controlling works. The territory drained by the Sag channel was within the watershed of the Illinois basin and in a state of nature belonged to that watershed. There was constructed along the Des Plaines river, several miles below the boundary of the district and above the controlling works, a concrete wall 200 feet in length on the west side of the canal and between the canal and Des Plaines river, known as the Willow Springs spillway, which served during flood times to permit the water of the Des Plaines river to spill over into the canal and discharge itself through the controlling works. All of the water flowing into the canal from the Willow Springs spillway in a state of nature belonged to the watershed of the Illinois river.

Plaintiff was organized as a levee and drainage district in 1897 and has operated since 1898. The right of way of the Chicago, Burlington and Quincy Railroad Company extends along the east side of the drainage district and across the Illinois river. The tracks as they approached the river from the north ran on a trestle, and in 1898 plaintiff filled in the trestle, making an embankment, which became and

was a part of the levees constructed by it. The flood in the Illinois river in the year 1922 began about March 8, and the crest or apex of the flood at Beardstown, Illinois, was April 20. On April 16 the flood became so high and the current of the river of such great velocity that that part of the levee of plaintiff formed by the railroad embankment broke, causing the district to be flooded, resulting in the damages complained of.

The uncontradicted evidence shows that immediately before the injury occurred to the plaintiff district, the Sangamon river, emptying into the Illinois river some ten miles above the works of the district, reached an unprecedented flood stage, the discharge from the Sangamon at Oakford, some twenty-five miles above its confluence with the Illinois river, on April 14 being 35,600 cubic feet per second, or 2,136,000 cubic feet per minute. Unusual rains occurred along the entire watershed of the Illinois river, and all of its tributaries, including the Des Plaines and Kankakee rivers, were discharging large quantities of flood water. The volume of the Kankakee river on April 11 showed a recorded discharge, near its confluence with the Des Plaines river where these two rivers form the Illinois, of over 30,400 cubic feet per second, or 1,800,000 cubic feet per minute.

Defendant introduced evidence showing that levees were constructed by drainage districts along the Illinois river and below the works of plaintiff from 1904 to 1922, to an extent that practically the entire flood flowage area of the Illinois river was obstructed; that in 1904 thirty-nine per cent of the flood waters of the Illinois river flowed outside of the channel over the low lands from Beardstown to Grafton; that since the construction of these levees the amount of flood waters flowing over the low lands was a negligible quantity; that the effect of the construction of these levees by the various drainage districts was to increase the flood stage on the 16th day of April, 1922, to an ele-

vation of five feet above what the flood stage would have been had the levees not been present.

The valley of the Des Plaines river from the power house at Lockport, to where the Des Plaines joins the Kankakee and forms the Illinois river, a distance of seventeen or eighteen miles, is about three-quarters to a mile wide and the fall of the river is 52 feet—almost three feet to the mile. From the head of the river to LaSalle, a distance of fifty miles, the valley is about two miles wide and the fall is 54 feet. From LaSalle to Peoria, a distance of sixty-one miles, the width of the river varies from 300 feet to one and one-half miles, and the fall is from three to four feet. This is the flattest part of the river and includes what is known as Peoria Lake, some sixteen miles long. The valley here varies from one and a quarter miles to three miles wide. From Peoria to the mouth of the Illinois river, a distance of 162 miles, the fall is 25 feet at low water. The width of the river for the first one hundred miles below Peoria is an average of 800 feet. The width of the river for the lower sixty miles is an average of about 1000 feet, and the valley from Peoria to a point north of the mouth of the Sangamon is from two to four miles wide, from north of the Sangamon to Naples the valley is from four to seven miles wide, and from Naples to its mouth is from three to four miles wide.

The evidence showed that the plaintiff district became flooded by reason of the embankment of the Chicago, Burlington and Quincy Railroad Company giving way. This embankment served as part of the protection of the district, the main levee along the Illinois river being connected with this embankment. The Burlington railroad after the first day of April had a force of some two or three hundred men and engines and trains employed in placing sand-bags and other material along the outer edge of the embankment to prevent the same from giving way. At the time the embankment broke, the water at places was from three to four

feet above the top of the ties, and was higher than the top of the railroad grade practically the entire distance of some four miles. With the flooding of the district the water overflowed and stood over the ditches within the district, damaged some of the bridges constructed across the ditches by the district at highway crossings, flooded the pumping plant, damaged the machinery and did material damage to the levees inclosing the district.

Defendant's first contention is that the Appellate Court should have reversed the judgment by reason of the action of the trial court in refusing to direct a verdict at the close of plaintiff's evidence and again at the close of all the evidence. The record comprises 2692 pages and the abstract thereof consists of 1506 pages. We have heretofore in this opinion, and shall hereafter, only set out so much of the facts as are pertinent to, and necessary for, a full understanding of the legal questions herein involved.

Section 20 of the Sanitary District act (Smith's Stat. 1927, p. 1151,) provides: "Any channel or outlet constructed under the provisions of this act which shall cause the discharge of sewage into or through any river or stream of water beyond or without the limits of the district constructing the same shall be of sufficient size and capacity to produce a continuous flow of water of at least 200 cubic feet per minute for each 1000 of the population of the district drained thereby, and the same shall be kept and maintained of such size and in such condition that the water thereof shall be neither offensive or injurious to the health of any of the people of this State; * * * and said district shall, at the time any sewage is turned into or through any such channel or channels, turn into said channel or channels not less than 20,000 cubic feet of water per minute for every 100,000 inhabitants of said district, and shall thereafter maintain the flow of such quantity of water." Section 23 of the act provides: ."If any channel is constructed under the provisions hereof by means of

which any of the waters of Lake Michigan shall be caused to pass into the Des Plaines or Illinois river, * * * if the population of the district draining into such channel shall at any time exceed 1,500,000, such channel shall be made and kept of such size and in such condition that it will produce and maintain at all times a continuous flow of not less than 20,000 cubic feet of water per minute for each 100,000 of the population of such district, at a current of not more than three miles per hour." Section 25 of the act provides for the joining of other territory to the district, and provides that "where the united flow of any sanitary districts thus co-operating shall pass into any channel constructed within the limits of the county wherein such districts are located, and which passes into the Des Plaines or Illinois rivers, such united flow shall in no case and at no time be less than 20,000 cubic feet of water per minute for each 100,000 of the aggregate of the population of the districts co-operating."

From a perusal of these sections of the statute and the allegations of plaintiff's declaration it is evident that it was vitally necessary for plaintiff, in order to maintain its action, to prove by competent evidence the population of the Sanitary District of Chicago on April 16, 1922, the amount of sewage flowing into its channel, the amount of water required to keep and maintain the stream of such size and in such condition that the water thereof should be neither offensive nor injurious to the health of any of the people of the State, the amount of water turned into the channel by the sanitary district, that such amount of water was unreasonably large and in excess of the amount authorized by law, and that such excess was the proximate cause of the damage to plaintiff's property. It is contended by defendant that plaintiff failed to prove each and every one of these material elements. It is plaintiff's contention that the Appellate Court having affirmed the judgment of the trial court and in its opinion stated that these elements

had been proven, we are bound by the opinion of the Appellate Court and are precluded from examining the evidence in the case. While under the law we are precluded from examining and weighing the evidence to determine where the preponderance of evidence lies or how the case should have been decided on the evidence, yet where, as in this case, motions were made to direct a verdict for defendant, it is our duty to examine the evidence for the purpose of determining whether, when all the evidence is considered, together with all the reasonable intendments to be drawn therefrom in its aspect most favorable to plaintiff, there is a total failure to prove any one or more of the elements necessary to be proven to maintain the cause of action alleged in plaintiff's declaration or some count thereof, (*Sterling-Midland Coal Co.* v. *Great Lakes Coal Co.* 334 Ill. 281,) and in so doing we must examine and consider the evidence itself and not the statements in the opinion of the Appellate Court as to what facts have been proven. In our examination of this question we have been greatly handicapped by the fact that plaintiff in its brief and argument has not referred us to the pages of the abstract where the evidence bearing on these questions could be found but has referred us to statements in the opinion of the Appellate Court that such facts had been proven, and thus necessitated our searching and re-searching, again and again, this great mass of evidence to ascertain whether or not there was any evidence proving or tending to prove each one of these material elements.

While this court will take judicial notice of the population of the various civil divisions of the State, such as towns, cities and counties, as shown by official census reports, it cannot take judicial notice of the population of school districts, (*People* v. *Board of Education,* 265 Ill. 618,) sanitary districts or other subdivisions or districts not shown by any official census. No documentary evidence was introduced showing the population of the Sanitary Dis-

trict of Chicago in April, 1922. No witness testified stating what its population was at that time or giving an estimate thereof. The only evidence with reference to the population of the sanitary district was given by two witnesses called by plaintiff. One of these was a stenographer residing at Rushville, employed in the office of one of the attorneys for plaintiff, who took a map of Cook county and noted thereon the population of the various cities, villages and other subdivisions outside of the sanitary district as shown by the census of 1920. There were six townships in Cook county that were partly within and partly without the sanitary district, some of which townships contained villages. As to these six townships the witness took the population of a township as shown by the census of 1920 and prorated it according to the areas within and without the district, without regard to and without any information as to where the villages in these townships were located or as to the particular areas where the population might be located. After she had made this map she did not total or tabulate the figures which she had noted on the plat. This was done by some other person in the attorney's office. Taking the total population of Cook county as shown by the census report for 1920 as 3,053,017 and subtracting therefrom 68,051, the amount shown by the tabulation of a third person (whose identity is not shown by the evidence) as the population of that part of Cook county lying without the limits of the sanitary district, as to the correctness of which limits she had no knowledge, the sanitary district being entirely within Cook county, she testified that the population which she arrived at by the computation which she had made for the sanitary district in 1920 was 2,984,966. The census was taken as of January 1, 1920. In making her statement she did not take into consideration any territory added to the sanitary district under the provisions of the act of 1921. It is, of course, impossible to ascertain the exact population of a growing

territory, such as the sanitary district, at any given time involved in any suit for damages. While plaintiff was bound to prove such population as of April, 1922, it was impossible to do so by an exact enumeration, and it was only bound to introduce the best evidence thereof of which the case was susceptible. A computation made by some unknown person could not be made the basis of an estimate, neither is it proper to ascertain such population by taking the aggregate population of a political subdivision lying partly within and partly without the district and dividing it in proportion to the respective parts. The proportion of acreage of the parts of the subdivision lying within and without the limits of the district can throw no light as to the respective populations, unless the surrounding circumstances, such as the comparative density of population and other circumstances, would enable a person versed in the subject and having a personal knowledge of the circumstances to make an intelligent estimate of the respective populations.

Plaintiff's other witness on the subject of population was an assistant chief engineer of the sanitary district. He testified: "I do not recall that I have made census tabulations at different times for the sanitary district for the purpose of ascertaining population or having submitted figures at different times that I have compiled. I appeared before the committee of the Sixty-eighth Congress investigating the Illinois and Mississippi rivers and diversion of waters from Lake Michigan,—before the committee on rivers and harbors in 1924 on behalf of the sanitary district,— and gave testimony there but not under oath." He was then asked by plaintiff's attorney, "And in that hearing you submitted an estimate of population of the district for the year 1920 among other years, didn't you?" This question was objected to by defendant and the objection was overruled. The witness was then shown a transcript of his testimony before the committee, and said: "I recall the fig-

ures now, since you have handed me a transcription of the hearing before the committee held in the city of Washington April 15 and May 27, 1924. (Part 2, on page 1551.) I took those figures from a population curve that we had drawn in the engineering department from the United States census figures for 1900. By census population curve I mean a curve that was drawn to indicate what the population had been in past years, which curve produced for future years would give you a reasonable estimate of what the future population would be. That curve, up to the time I testified in 1924, was based on the actual census figures published by the United States government for 1900, 1910 and 1920. Beyond 1920 it was produced it was the curve drawn through those years 1900, 1910 and 1920. The figure was taken from that curve. The figure was a curve drawn through those three years of known figures." He was then asked by plaintiff's attorney, "I will ask you what those figures show for 1920—the United States figures for the sanitary district?" This question was objected to, the objection was overruled, and the witness answered: "This figure for 1920 given at that hearing before the Rivers and Harbors Committee was 2,986,000." Defendant then moved that the answers in reference to the population of the sanitary district as testified to by the witness be stricken, which motion was denied. He testified that he did not have with him at the time of the congressional hearing the computation but did have its result; that the testimony that he gave in reference to the population was only the information that was furnished him by the parties that compiled it; that he did not do anything personally with the compiling of it; that he did not individually know whether it was correct or not, and that he did not know whether it was compiled from the information given by the Federal government or not. If someone shown to have authority to do so had prepared a table showing the population curve for the various years from

1900 to 1924 and it had been presented to the congressional committee by someone authorized to represent defendant, it would have been competent for plaintiff to prove by competent evidence the contents of such table as an admission on the part of defendant. It was not competent for plaintiff to inquire of its own witness as to a statement made by him on a former occasion, when not under oath, as to the contents of a written instrument prepared by some other person and as to the accuracy of which such witness had no knowledge. Plaintiff's question was likewise objectionable on the ground that the question assumed that the figures shown for 1920 were the United States figures for the sanitary district, while the evidence is that they were not figures of the United States. Defendant, however, is hardly in a position to take advantage of this ruling, as on cross-examination of this witness its counsel had the witness state the estimated population of the district, as shown by the population curve, for each year from 1900 to 1921, inclusive. After the witness had given the figures 3,000,000 for 1921 an objection to the answer was sustained, and the court ruled that plaintiff did not go beyond the year 1920 and that defendant could not do so. On his direct examination the witness had testified that the population curve included what the population was up to 1924 and testified how the portion after 1920 was produced. The year 1922 was the year as to which evidence as to population was material. The questions sought to be propounded were strictly cross-examination of matters brought out by plaintiff on direct examination, and in fairness the court should have allowed defendant equal latitude with plaintiff, especially as the year 1922 was the one as to which the evidence was pertinent to the issue.

Plaintiff contends that the population in the district in 1920 having been shown, the presumption is that the same state of facts continued and that the population of the district remained the same until April, 1922. Were this a

legitimate presumption in this case it would be neutralized by the counter-presumption that the officers of the sanitary district are presumed to have done their duty. (*Beebe* v. *Kirkpatrick,* 321 Ill. 612.) This presumption of continuance cannot be given any weight in this case. A presumption is not evidence and cannot be treated as evidence. It cannot be weighed in the scale against evidence. Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered the presumption vanishes entirely. (*Sharp* v. *Sharp,* 333 Ill. 267; *Brown* v. *Brown,* 329 id. 198; *Osborne* v. *Osborne,* 325 id. 229; *People* v. *Cochran,* 313 id. 508.) Plaintiff introduced evidence showing that the population of the district had been increasing yearly since the organization of the district. The United States census, of which we take judicial notice, shows that the population of Cook county increased from 1,838,735 in 1900 to 2,405,233 in 1910 and to 3,053,017 in 1920, showing an increase of 30.08 per cent from 1900 to 1910 and of 26.09 per cent from 1910 to 1920. From the same source we learn that the population of the city of Chicago in the district increased from 1,698,575 in 1900 to 2,185,283 in 1910 and 2,701,705 in 1920. There is no competent evidence in the record showing, either directly or by inference, what the population of the sanitary district was April 16, 1922. Both parties having introduced incompetent evidence on the subject of population, appellant is not in a position to take advantage of this lack of evidence, and we have discussed appellant's argument with reference thereto *in extenso,* not for the purpose of showing a basis for reversal but for the purpose of avoiding further error on a re-trial.

No records, tabulations or other documentary evidence, or evidence of any person having personal knowledge thereof, was introduced showing the amount of sewage coming

into the canal in April, 1922, or at any other time. One expert testified that in his opinion the sewage in the canal constituted, on an average, one-seventh of the flow. Another expert testified that the average daily discharge of sewage of the city of Chicago going into the Chicago river and channels leading into it was approximately 1200 cubic feet a second for the month of April, 1922; that there were periods when it went higher and others when it went lower, but the normal daily flow was somewhat above 1200 cubic feet a second. These figures do not include the sewage from the many other cities, villages and towns in Cook county whose sewage flowed into the canal. No evidence was introduced tending to show the amount of water necessary to be turned into the channel to so dilute this mass of sewage as to keep and maintain the same "in such condition that the water thereof shall be neither offensive or injurious to the health of any of the people of this State." Neither is there any evidence in the case that the amount of water turned into the channel was sufficient in amount to prevent the sewage from becoming obnoxious and injurious to the health of the people of the State. Not only is there no evidence in the record that the amount of water turned in was in excess of the amount for this purpose, but there is some evidence tending to show that the amount was insufficient, so that, in fact, the water was obnoxious many miles down the river. This requirement that the water turned into the canal shall be sufficient to prevent its being obnoxious and injurious to any of the people of the State applies as well to the people of Chicago as it does to those in Joliet, Ottawa, LaSalle, Peoria, Havana, Beardstown, or any other place outside the city of Chicago, and so requires a sufficiency of water for that purpose the instant the sewage comes into the canal.

In 1901 the legislature passed an act authorizing the Sanitary District of Chicago to construct dams, waterwheels and other works north of the upper basin of the

Illinois and Michigan canal necessary or appropriate to develop and render available the power arising from the water passing through its main channel and any auxiliary channels, and providing for the conversion of the power made available by such works into electrical energy to be transmitted to the various cities, villages and towns within the sanitary district or adjacent to its main channel for their lighting thereof and for the operation of pumping plants or machinery used for municipal purposes or for public service or for disposal to other persons or corporations, and making it the duty of the sanitary district to utilize so much of the power as might be required for the purpose of operating the pumping stations, bridges and other machinery of the district. Thereafter, in accordance with the provisions of this act the sanitary district constructed dams and the necessary plant for carrying into effect the provisions of the act, and on April 16, 1922, and for several years prior thereto, this plant was in operation for the generation of electricity, and a large part of the waters of the drainage canal was utilized for such purpose. The flow through the turbines was computed by the amount of kilowatt hours of electricity generated, tables for making such computation being introduced in evidence by plaintiff. It is claimed by plaintiff that the generation of electricity was not one of the primary purposes of the act and that the water used for this purpose was in excess of that necessary for dilution of the sewage. A sanitary district is a municipal corporation organized to secure, preserve and promote the public health. Any subsidiary measure having a greater or less tendency to promote that object or to advance the general scheme by which it is proposed, through the agency of such organization, to preserve and protect the public health is germane to the general subject of the act. Where a corporation is authorized to construct channels for drainage purposes, whereby, incidentally, large and valuable water power may be created and opportunity afforded for

the utilization of the waters for the generation of electrical power, the corporation may utilize such power as a source of revenue for the purpose of paying its indebtedness incurred in the construction and maintenance of the channel and thus lighten the burden of taxation upon the property of the district. (*People* v. *Nelson,* 133 Ill. 565.) In the instant case much time was consumed in the examination of witnesses as to the extent of the district's use of the waters of the drainage canal, and many tables of gauge readings, flowage and computations of experts with reference thereto were introduced in evidence. The undisputed evidence shows that all the waters which were used for the generation of electricity were waters of the drainage canal mingled with sewage, and that no waters were utilized for that purpose by defendant except such as were mixed with sewage. The evidence does not show that at any time there was more water used by defendant for the generation of electricity than would necessarily have flowed in the drainage canal for the purpose of the proper dilution of the sewage. There was no time at which all the waters of the drainage canal, mingled with sewage, were used by defendant for the purpose of generating electricity.

Plaintiff claims here, and the Appellate Court in its opinion states, that "the theory of the plaintiff is that the defendant was authorized by the statute creating it to flow into the Illinois river an amount of water not exceeding 20,000 cubic feet per minute for each 100,000 population of the district, unless necessary for the proper dilution of the sewage." The estimates used by plaintiff in this case, and upon which it based instructions, hypothetical questions and argument to the jury, are upon the basis of allowing a maximum flowage by defendant of not more than 600,000 cubic feet per minute. Concerning this contention this court in *Kuhne* v. *Sanitary District,* 294 Ill. 430, said: "It will thus be seen from an examination of the act under which defendant is organized that it is authorized to flow a suffi-

cient amount of water to properly dilute the sewage and render the water not offensive or injurious to the health of any of the people of the State, provided that the amount of water to be flowed shall in no case be less than 20,000 cubic feet of water a minute for each 100,000 of the population of the district. Plaintiff contends that the 20,000 cubic feet is the maximum amount of water authorized to be flowed through the channel, and that the flowing of a greater amount through the channel is unauthorized and therefore unlawful. That this contention cannot be sustained seems too plain to require argument."

The controlling works at the lower end of the canal was the place nearest its source where the flow of the canal was measured. Its discharge was ascertained by computation of the flow through the various openings. Employees of defendant reported the flow daily, and these reports were entered into a large book known as the "discharge record," each page of the record containing the discharge, as computed, for one day, the measurement of the discharge being taken for each half-hour period during the day. These measurements included not only the amount of water turned into the channel for the purpose of diluting the sewage, but the sewage itself and other waters entering the channel at various places between its source and the controlling works. The records also showed the daily flow through the channel. This daily flow was ascertained from computations using the average of the half-hourly flowage as a basis. The law did not require the taking of half-hourly measurements or the making of a record thereof. These measurements and records were made for the information of the officials of the district in order that they might understandingly perform their official duties. These half-hourly measurements showed that at times the discharge from the controlling works was somewhat more and at other times somewhat less than 20,000 cubic feet per minute for every 100,000 inhabitants of the

district, assuming, as plaintiff did, that the population of the district was 3,000,000. A computation based upon the discharge records shows that on only four days did the average discharge of the combined water and sewage per day exceed 600,000 cubic feet per minute. While the declaration alleged that the flowage of the waters of the sanitary district during the five years immediately preceding the commencement of the suit exceeded the flow thereof through such channel during the period from the commencement of the flow through it and ending with the period five years prior to the commencement of this suit, there is no evidence to sustain this allegation. The only evidence of the discharge of the canal was the evidence contained in the discharge record of the controlling works introduced by the plaintiff, except the testimony of a witness for the plaintiff who testified that a sustained flow of from 10,000 to 11,000 cubic feet of water and sewage per second was the extent of the flowing capacity of the canal. The discharge record covered a period from October 1, 1920, up to and beyond April 16, 1922. There was no evidence whatever as to the quantity of water and sewage discharged through the canal prior to October 1, 1920.

It is contended by plaintiff that defendant did not maintain a continuous flow through the canal, basing its contention on the variation between the half-hourly periods as shown by the discharge report, and over the objection of defendant the court permitted an expert to testify as to the force and effect of waves caused by such variation throughout the length of the Illinois river and extending to plaintiff's district. The Drainage act did not require that the amount of water in defendant's channel should at all times be uniform, but, on the contrary, did require it at all times to have sufficient water therein to dilute the sewage so that it should not be obnoxious or injurious to the health of the people. As the amount of sewage turned into the channel naturally varied from time to time and

varied from hour to hour of each day, so, naturally, the amount of water which defendant was required to turn into its channel varied from time to time and from hour to hour in accordance with the amount of sewage turned into the channel. While the act required the channel to be of sufficient dimensions for a continuous flow of the amount of water specified in the act, it did not require that the amount of water turned into the channel should be uniform. The words "to produce a continuous flow," found in the act, have reference only to the size to which the channel should be constructed. The language dealing with the operation of the channel is, "at the time any sewage is turned into or through any such channel or channels, turn into said channel or channels not less than 20,000 cubic feet of water per minute for every 100,000 inhabitants of said district, and shall thereafter maintain the flow of such quantity of water." The words "not less" fix a minimum and not a maximum amount, and necessarily require defendant to vary the flow above that amount from time to time if necessity requires an increased flowage for the purposes of sewage dilution. While the declaration charges that it was the duty of defendant to maintain a continuous flow, the declaration does not charge any damage resultant from a violation of that duty or in any manner charge that a violation of that duty was one of the proximate causes of the damage resulting to plaintiff. The only damages alleged in the declaration are those alleged to be resultant from an excessive flow of water. If defendant violated the provisions of the act by turning into the canal or channel a lesser amount of water than was required by law, this would not result in damage to plaintiff by reason "of an excessive flow of water." Complaints as to violation of the act by reason of a lesser flow than that required by law could only be entertained on behalf of the State or some persons showing special injury by reason of the sewage becoming obnoxious or dangerous to health by reason thereof.

Prior to 1922 the elevation of the levees of the plaintiff district was 104 Coal Creek datum. After the flood in April, 1922, plans were adopted by which the elevation of the levees was raised to 107.2 of that datum plane, and a contract for the construction of the levees to such increased elevation was let at a certain unit price per cubic yard. The levees were constructed to the increased elevation and paid for at such unit price. In making proof of the damage to the levees of the plaintiff district plaintiff offered in evidence an assessment roll showing that an assessment had been spread against the lands within the district for the amount of $152,250 for benefits, for the limited purpose of showing that the district did levy a special assessment and authorized a bond issue to raise money immediately following the flood. This proffered evidence was objected to by defendant, the objection was overruled and the exhibit admitted for the limited purpose for which it had been offered. A motion was then made to exclude it, and overruling this motion the court said: "It will be excluded for all purposes except to show that there was a special assessment made and for the purpose of laying a foundation for showing what would be the reasonable costs testified to by the different witnesses to repair that district to its former condition." There was no evidence in the record to show for what purpose the assessment was spread. It contained the names of all the land owners within the district, the amount assessed against the various tracts of land, and the order of the court confirming the assessment. It was for a much greater amount than the amount which the evidence shows had been expended by the commissioners of the district in making the needed repairs. It could in nowise lay a foundation for showing what would be the reasonable cost testified to by the different witnesses to repair the district to its former condition. Its only effect upon the jury, when considered in the light of the statement of the court, would be to lead them to believe that the cost of making the neces-

sary repairs resultant from the injury done plaintiff's works by defendant amounted to $152,250. The assessment roll was not competent evidence in this case for any purpose.

An expert witness called by plaintiff testified that he had taken the discharge record introduced by plaintiff, and from the measured discharge at the controlling works, without making any deductions for sewage or any flow coming into the canal from the Sag channel or the Willow Springs spillway, computed the volume of water and sewage where the half-hour periods showed a discharge of over 600,000 cubic feet per minute, after adding twelve per cent for loss of efficiency of the turbines. He computed the total amount of such excess from March 10 to April 16, disregarding all half-hour periods where the record showed a flow below 600,000 cubic feet per minute, the discharge record showing that approximately three-fourths of the time the discharge was less than 600,000 cubic feet per minute, sometimes as low as from 200,000 to 300,000 cubic feet per minute. He testified that during the period from March 10 to April 14 there were only four days when the average total flow exceeded 600,000 cubic feet per minute. The undisputed evidence shows that the waters which passed through the controlling works on the date when his computation showed the flowage to be the greatest could not have reached plaintiff's district when the railroad embankment broke and the damage to the district was sustained. Basing his testimony on the above assumptions, the witness was permitted to testify, over the objection of defendant, that in his judgment the effect of what he characterized as excess flowage was to raise the flood stage of the Illinois river at Beardstown seven inches. This evidence was admitted upon plaintiff's attorneys agreeing that it might be stricken unless it was shown that defendant did not have the right to discharge in excess of 600,000 cubic feet per minute and unless other connections were made. Plaintiff not having made the connections and the evidence having

failed to show that a flowage of over 600,000 cubic feet per minute was in excess of the amount required to properly dilute the sewage so as to prevent the same from becoming obnoxious and injurious to the health of the people of the State, and no evidence having been introduced showing the amount of waters passed through the controlling works other than those introduced into the channel by defendant, defendant made a motion to strike this evidence from the record, and the motion was denied. The evidence was based on assumptions not shown by the evidence, no proper connection was shown, and defendant's motion should have been allowed and the evidence stricken from the record.

Defendant offered in evidence at the trial a part of House Document No. 276, being a report of an investigation by the Federal government on flood control on the Illinois river, published under the direction and authority of the government. The matters offered in evidence by defendant from this document were:

"22. *Flood of 1922.*—This flood resulted from an unusually long-continued period of rainfall. Discharge measurements made by the United States geological survey during the flood of 1922 indicate that the discharge during this flood was about seventy-five per cent of that in 1904 at Peoria and Havana and ninety-five per cent at Beardstown. The higher percentage at Beardstown was due primarily to the excessive rainfall in the Sangamon valley, where the average rainfall from March 10 to 14 was 3 inches, March 19 and 20, 1.4 inches, March 24 to 31, 2.9 inches, and April 3 to 18, 5.4 inches—a total of 12.7 inches in about five weeks. The maximum 24-hour rainfall recorded was at Morrisonville, in the Sangamon basin, and amounted to 4.4 inches. The Sangamon was at a flood stage for several weeks, reaching a maximum discharge of approximately 39,000 second-feet at its mouth on April 14. A maximum discharge of 30,400 second-feet

was also observed on the Kankakee river near its mouth. The flood flow from the Sangamon river has undoubtedly been increased by the channel-straightening and levee-building operations along that river during the last few years, while the discharge of the Kankakee has been increased by the recent construction of large drainage ditches through the extensive Kankakee marshes in northern Indiana. The excessive gauge heights attained by the 1922 flood as compared with the volume of discharge were undoubtedly due to the reduction in the width of cross-section of the flood plane, caused by the construction of levees.

"26. *Early levees.*—The first levees of any importance were begun in 1890. They were of sufficient height for ordinary floods but of small cross-section, and constructed by land agents to sell the land rather than to prevent flooding. As late as 1904 less than half a dozen levees had been completed along the river, and two of these failed during the flood of that year.

"27. *Levee encroachments.*—In 1913 the construction of levees had reduced the width of the flood plane in the valley below the LaGrange lock approximately seventy-five to eighty-five per cent. Between Montezuma and Valley City the width was reduced from 20,000 feet to less than 2000 feet. The construction of levees was continued, so that by 1922 this radical reduction in width of flood plane extended up to Peoria. In some localities the land owners became even more grasping or indifferent than before, the minimum width of the flood waterway being reached at a point about four miles below Beardstown, where the distance between levees is less than 1100 feet. The river is leveed on both banks at this locality, this work having been completed since 1916. As a result, the fall from Beardstown to LaGrange lock, a distance of eleven miles, which was approximately one foot during the floods of 1913 and 1916, was increased to approximately 2.8 feet during the

flood stages of 1919, 1920 and 1922. The extent to which the former flood plane is now occupied by levee districts is shown on the map accompanying this report.

"37. *Regulation of flow through the Chicago drainage canal.*—A large majority of the people along the river insist that recent floods have been caused in a large measure by the discharge of excessive amounts of water through the Chicago drainage canal into the Des Plaines and thence into the Illinois river. It therefore seems necessary to remark that the flow through the Chicago drainage canal is kept under observation by this office, and it may be stated with confidence that the average flow through the drainage canal is approximately 9000 cubic feet per second. There is no reason for increasing this amount during the periods of flood on the Illinois river. This amount, of course, is not negligible. It has been estimated that the effect of the sanitary district flow on the flood height of 1922 at Peoria was to raise it eighteen inches, at Havana twelve inches and at Beardstown six inches. It is clear that the Chicago drainage canal is not responsible for the excessive height of the 1922 flood, as so many people so vehemently assert.

"55. Below Peoria the construction of levees has reduced the available cross-sectional area of the flood flow about seventy per cent, and this construction has progressed to a stage where the levees are a menace to themselves.

"57. The present flow of approximately 9000 second-feet from the Chicago drainage canal raises the flood level about eighteen inches at Peoria, about twelve inches at Havana and about six inches at Beardstown.

"65. All reclamation work thus far accomplished on the Illinois river has been at the expense of local interests. Due to lack of expert knowledge and for other reasons the levees have been improperly located and have become a menace to themselves through not having sufficient waterway between them. They have caused no serious interference with navigation."

It is contended by defendant that the court erred in refusing to admit this document. This report is only the estimate of the persons who were stated in the report to have made it, contains many hearsay statements, and contains the statement, "It is clear that the Chicago drainage canal is not responsible for the excessive height of the 1922 flood, as so many people so vehemently assert." This evidence was not competent. *Smith* v. *Sanitary District,* 260 Ill. 453.

Defendant complains of many improper remarks made by counsel for plaintiff during the trial. Among the statements complained of are the following, made in the addresses to the jury:

"They say they had a lot of leakage and lockage—boats going up and down that great ship canal. That great ship canal! Boats going up and down. Boats from the East coming down there. You have never heard of them, but that is what they talk about when they want you to vote to give them more money—about a deep waterway. * * * Along about that time some of the boys up there says, 'Boys, we have handed them enough last night,' and he cut off the flow and he stayed off for half an hour, and he only flowed nine and a half per cent excess, and he stayed off another half-hour. Then another fellow came along, and he says, 'We don't want this sewage up here in this town; we don't want to turn it into the lake; turn it on again boys.' * * * Then I don't know how they did it, but they changed it again. Maybe they greased up the bear-trap dam and the 48-foot dam, but they wanted the electricity. * * * Here is a main river, and this sanitary district should have known the conditions upon the river. It knew that district after district was breaking, day after day, day after day; and if you were human and you knew that it would cost you a few dollars to keep from ruining your neighbor from your lawful water you wouldn't have done it. But this sanitary district knew it all the time; knew the conditions of it;

kept a record of it; had to. They knew what was going on down the river. They knew what would happen, but they said, 'We will try it; we will go ahead and find out, and we will go ahead and fight it out in court.' "

When objections were made to the last quoted remark and the court made the statement, "Yes, I think that is objectionable," the attorney proceeded:

"I stand corrected, gentlemen, if that is wrong. They say, 'We will fight it out in court if we have to. We have a chance to get engineers to testify as well as they will. We will bring here engineers from New York and Omaha and you can have your Illinois river engineers.' * * * Now, gentlemen, they would rather spend $20,000 for expert testimony alone in this case than to pay for one acre of corn that a tenant in that district has when he has to flee from their nasty sewage like he was fleeing from the wrath of God. That is the story that is here. * * * Oh, yes, but he says, 'If by some chance the lawful flow was exceeded, yet the sanitary district of Chicago's sacred treasury, which appears to be devoted to the payment of experts, must be protected against this unlawful raid of the Coal Creek Drainage and Levee District, because there is no evidence that any unlawful flow had anything to do with the damage.' * * * Dream of a century—a highway from Chicago to St. Louis. Yes, gentlemen, and with a fixed bridge every few feet across the sanitary district canal which have not got a draw in them. A waterway—boats going under those bridges like a procession."

When objection was urged to this last statement as not based on any evidence or any issue, the court overruled the objection with the statement, "No, I think that is argument; I think that is purely argument, proceed." Counsel continued:

"Somewhere may be the hot place, or it may be around one of those gates that they didn't get any record of. It may be one of those holes in this big book that Ramey told

you didn't tell the truth—didn't record all the flow up there.
*   *   *   For, gentlemen, do you know that when this
slimy trail of nasty, dirty, smelly sewage of Chicago is
pouring down this valley, reaches this end of the valley,
smears this land all over, if you pulled the dikes down and
left it in you couldn't hire a reptile to light in it.   They
are putting that, as the evidence shows, in the upper reaches
of the river—six inches, one foot, two feet, three feet, four
feet, according to the United States engineer, of the nasty,
smelly, black, greasy stuff settling in our river.   Do you
imagine that you can catch a fish up there that is not cov-
ered with scabs?   You wouldn't eat one if you could catch
it.   Wait until it gets down here, and statistics show it is
coming down at the rate of five miles a year."

These various remarks were highly improper and could
have been made for no purpose other than that of inflam-
ing the minds of the jury and prejudicing them against de-
fendant.   The remark last above quoted certainly is highly
inconsistent with plaintiff's claim that defendant was turn-
ing more water into the drainage canal than was necessary
to properly dilute the sewage so that the same should not
become obnoxious and injurious to the health of the peo-
ple.   Argument of counsel is for the purpose of assisting
the jury fairly, deliberately and impartially to arrive at the
truth of the facts submitted to them for their decision, and
it is highly improper for an attorney to do or say anything
in argument the only effect of which will be to inflame the
passions or arouse the prejudices of the jury against one
of the parties without throwing any light upon the question
for decision.   (*People* v. *Bimbo,* 314 Ill. 449.)   Litigants
are entitled to a fair, dispassionate and impartial trial, and
counsel who overstep the bounds of propriety in argument
and so prevent such trial have no ground for complaint
when courts of review correct their misconduct by grant-
ing new trials.

Defendant assigns as error the action of the court in the giving of instructions asked by plaintiff and the refusal of instructions asked by defendant. Plaintiff's reply to this is, that defendant, having violated the rule with reference to overburdening the court with too many instructions, is not entitled to have the instructions reviewed in this court, and cites certain authorities which condemn the practice of tendering many instructions but do not sustain plaintiff's contention as to review. The office of instructions is to give information to the jury concerning the law of the case applicable to the facts of the case for immediate application to the subject matter before the jury. (*Reivitz* v. *Chicago Rapid Transit Co.* 327 Ill. 207.) It is not necessary or proper to encumber the record with instructions covering the same matters, differing only in verbiage. Such practice tends rather to confuse than to enlighten the jury. (*Central Illinois Service Co.* v. *Deterding,* 331 Ill. 277.) Where the issues in a case are simple and the jury are fairly and fully instructed as to the law it is not reversible error to refuse further instructions even though they correctly state the principles of law. (*Freesen* v. *Scott County Drainage District,* 283 Ill. 536.) In the instant case the pleadings were long and complicated. The trial was lengthy. A mass of evidence consisting largely of the testimony of experts, gauge readings at different points along the Illinois river, extended tables of computations, discharge records, readings of the discharges from the turbines, and other evidence sufficient to bewilder almost any jury, was introduced. Eighty-four instructions were tendered by plaintiff and defendant, twenty-nine of which offered by plaintiff were all given, and of the fifty-five offered by defendant thirty-two were given and twenty-three refused. While the giving of more than sixty instructions in this case might well have tended to a further bewilderment of the jury, and of those given on each side several were mere repetitions and might well have been refused,

yet it is the right of a litigant that the instructions given should correctly state the law applicable to the case, and, if he so desires, to have the jury instructed upon every phase of the law applicable to the evidence in his case. In the instant case many of the instructions offered by defendant were mere changes in verbiage from the statements of law made in other instructions and were properly refused and will not be here discussed. What we have heretofore said in this opinion disposes of the legal questions involved in the objections made to plaintiff's given instructions, except as to Nos. 3 and 49. The only part of No. 3 which is pertinent to the issues in this case was given in another instruction, and the remainder of the instruction could only have tended to mislead the jury as to the population of the sanitary district. No. 49 is as follows:

"The jury are further instructed that the purpose for which the Sanitary District of Chicago was created and exists is to provide an outlet for the sewage of the population of the said Sanitary District of Chicago, and that while it has authority to use the water which it may lawfully take for the purpose of diluting sewage at the rate of 20,000 cubic feet per minute for each 100,000 of inhabitants of said district, yet you are further instructed that the said sanitary district has no lawful right or authority to take and flow water into the Des Plaines river and thence into the Illinois river for the primary purpose of creating electrical energy for any purpose; and you are further instructed that if you believe from the evidence that the said Sanitary District of Chicago in 1922 in March and April did flow water through its controlling works coming from Lake Michigan for the primary purpose of creating electrical energy and not for the purpose of diluting its sewage at the rate of 20,000 cubic feet per minute for each 100,000 population of said district and that the water so taken and flowed for the primary purpose of creating electrical en-

ergy flowed thence from said controlling works down the Des Plaines and Illinois rivers and finally overflowed the plaintiff district by causing the Illinois river to rise and flow into said district as charged in the declaration and thereby the plaintiff's various dikes, ditches, pumping plant and buildings were injured, damaged and destroyed as charged in the declaration, then you are instructed that you should find the defendant guilty and assess the plaintiff's damages."

The purpose for which the Sanitary District of Chicago was created was not solely to provide an outlet for the sewage for that district, but was also to secure, preserve and promote the public health by providing for drainage and the dilution of sewage. This instruction also tells the jury that the amount of water which defendant might lawfully take for the purpose of diluting sewage was at the rate of 20,000 cubic feet per minute for each 100,000 inhabitants of the district, and in effect tells the jury that the flowage of a greater amount would be unlawful. The amount stated in the instruction was not the amount which the act provided might lawfully be taken and utilized by the district for the purpose of diluting sewage but was the minimum amount which defendant was compelled by law to turn into its channel. The amount which defendant might lawfully take for the purpose of diluting sewage was not the amount stated in the instruction, but was such an amount, whatever that might be, which would be necessary for the proper dilution of the sewage to such an extent that it would not be obnoxious or dangerous to the people of the State. This instruction did not state the law correctly and its giving was error.

Instruction No. 68 offered by defendant, after quoting the provision of the statute for the construction of the canal, its size and capacity, above herein quoted, contained the following: "That the words 'continuous flow' in the statute have reference to the capacity of the channel and not the manner in which the same shall be operated." This

instruction was applicable to the evidence and was decisive of one of plaintiff's contentions and should have been given.

Instructions Nos. 69 and 83 were as follows:

69. "The court instructs the jury that in determining the quantity of water that is required to flow through the canal of the defendant leading from the city of Chicago to Lockport, Illinois, they should not take into consideration any flood waters of the Des Plaines river that might overflow into said canal and if the evidence in this case shows that any such flood water overflowed into said canal the same should be deducted from the discharge measurements in evidence."

83. "The court instructs the jury that in determining the issues in this case if they believe from the evidence that the volume of water as shown by the evidence in this case discharged through the canal of the defendant, the Sanitary District of Chicago, was during the month of April, 1922, and especially at such time in the month of April as the complainant in this case alleges that the flow from such canal was illegal and unauthorized and caused the damages in question, increased by means of waters draining into said canal from what is commonly known as Sag channel, and that such waters so draining into said canal from said Sag channel would and did in a state of nature flow into the Illinois river through its tributaries, such water should be deducted from the measured flow in determining the amount of flowage in said canal."

Defendant was only responsible for waters which it turned into the channel, and the place where it turned waters into the channel was many miles away from the places where the waters mentioned in these instructions entered the channel.

Instruction No. 75 was as follows:

"The court instructs the jury that the amount of water authorized to be flowed through or into the canal of the defendant is based upon the population of the territory

of said district draining into said canal; that the defendant is required to flow 20,000 cubic feet of water per minute for each 100,000 of the population of said district; that the burden of proving what the population of said district was at that time that the injury alleged in the declaration occurred to plaintiff's works is upon the plaintiff and if the plaintiff in this case has failed to prove what the population of said district was on and immediately before the 16th day of April, A. D. 1922, the plaintiff cannot recover in this case and you should find the defendant not guilty."

This instruction stated the law correctly, and was especially applicable in view of the fact that plaintiff in the trial court, in the Appellate Court as shown by its opinion, and in this court, has argued that defendant should have made proof of this subject. The principles announced in none of these refused instructions were contained in any other instruction given to the jury, and the trial court erred in refusing to give them.

Many other assignments of error are argued, but they are mostly such as are not likely to arise on another trial. To discuss them in detail would only tend to unduly lengthen this opinion.

The trial court erred in the admission of evidence, the giving of instructions to the jury, the refusal to give proper instructions, and in denying defendant's motion to instruct the jury to find for the defendant by reason of the failure of proof as to allegations of the declaration necessary to constitute liability. For these errors and the misconduct of plaintiff's attorney in his remarks to the jury the judgments of the circuit and Appellate Courts are reversed and the cause remanded to the circuit court of Schuyler county.

*Reversed and remanded.*

Mr. CHIEF JUSTICE FARMER, dissenting.