Board of Trade of the City of Chicago, Appellee, v.
J. K. Company, Appellant.

Gen. No. 38,973.

Opinion filed May 19, 1937.

ANDREW J. FARRELL, of Chicago, for appellant;
JAMES L. COLEMAN and ALLAN J. MOORE, both of Chicago, of counsel.

JOHN A. BLOOMINGSTON, of Chicago, for appellee;
BEN W. GOLDMAN, of Chicago, of counsel.

MR. JUSTICE HALL delivered the opinion of the court.
By this appeal, defendant seeks the reversal of a judgment for the sum of $3,500, entered in the superior

court of Cook county against it and in favor of plaintiff. The trial was before the court and a jury, and the jury returned a verdict for the amount of the judgment.

On December 23, 1932, Charlton H. Duvall, an employee of plaintiff, was killed in an explosion and fire which occurred in a grain elevator owned and operated by the defendant. Prior to this suit, plaintiff paid his widow the sum of $3,500—the amount of the judgment. It now seeks to recover the amount paid, as provided by section 29 of the Workmen's Compensation Act of the State of Illinois, Ill. State Bar Stats. 1935, ch. 48, ¶ 229; Jones Ill. Stats. Ann. 143.44, by which both plaintiff and defendant were bound, upon the theory that Duvall met his death through the negligence of the defendant. The suit was originally brought against the Stratton Grain Company, and pending the proceeding, the name of the corporation was changed to the J. K. Company, and the change in name was made a matter of record by proper amendment.

On December 23, 1932, the day Duvall met his death, as the record indicates, he was employed by the plaintiff as a scale inspector, and had been so employed for many years, and that on that date, Duvall arrived at defendant's place of business about 9:30 in the morning and went upstairs to the scale room, which is about 140 feet from the ground, for the purpose of testing the scales; that while he was so engaged, there was a sudden puff of smoke and an explosion, and that an employee of the defendant named Garrity and Duvall started to run. Garrity was rescued, but Duvall has never been seen since the fire and explosion. The record further indicates that the elevator building of defendant was about 250 feet long and about 160 feet high, and had seven floors consisting of a basement floor, the work house floor, bin floor, belt floor, garner

floor, scale floor and top floor. In the building there were 10 elevator legs, which are described by witnesses as consisting of endless belts with buckets bolted on each, and that each of the legs was encased in sheet iron, and extended from the basement of the building to the top, and that they were used to carry the grain dumped from a railroad car into the elevator proper. It is in evidence that adjoining the elevator proper were two small buildings, known as dryer and dust house, and that beyond these two buildings was an engine room, which contained two 300-horse-power engines, and that the only part of the machinery which extended into the elevator proper was a main shaft, which connected with the elevator legs. It is further shown that there was an electric alarm system used in the elevator, and that there was an automatic system connected with the alarm system, which caused a bell to ring when 165 degrees Fahrenheit was reached; that the alarm system was inspected about every two weeks, and had been inspected two weeks prior to the date of the accident. It is also in evidence that the elevator had a sprinkler system covering the entire elevator building, which consisted of water pipes and a number of valves; that these valves had lead in them, which melted when exposed to a temperature of 190 degrees, and that when the valves were released, water would flow from them; that the building had numerous windows and was lighted by electric lights, which were inspected by an employee of the Santa Fe Railway; that the elevator was equipped with vapor-proof lighting; that there were about 800 electric globes throughout the building, and that all the electric wiring was inclosed in conduits; that throughout the building were floor sweeps, which are described as openings in the floor into which dust was swept, and which were connected with pipes and tubes, for carrying the dust to

the dust house before mentioned that these tubes were of galvanized iron, and that suction was created to convey this dust by the use of fans,—one fan being located on the main floor and one on the belt floor. It is further shown that the employees of defendant at various times swept dust from the walls, rafters and floors into these floor sweeps. The record indicates that when grain arrived at this elevator, it was loaded into hoppers and carried into the elevator.

A witness for plaintiff named Patrick Garrity testified to the effect that prior to the accident, all the floors up over the bin floor were clean, as they were swept practically every day; that only about 1,500 bushels of grain had been taken up on the morning of the accident; that at the time of the explosion and fire, there were no blowers or exhaust fans over the top of the belt housing and that there were no exhaust fans or blowers on the windows. This witness also testified that each storage bin had vents on top, but that there were no fans connected therewith.

A witness for defendant named George Spencer, an electrician, testified that he made his last inspection of the motors, lights, electric wires, etc., on October 25, 1932, and that he did some work there on November 29, 1932, and that everything looked clean to him, and that the sprinkler system and other machinery appeared to be in good condition. This witness also stated that his inspection included the whole elevator, and that about four months prior to the explosion, he saw a man blow the dust off the conduit with a hose, and that in August prior to the explosion, in an electrical storm, lightning had struck a conduit and burned a wire, but that he repaired it and left it and the other electric appliances in good condition. He also testified to the effect that there were about 800 lamps in the elevator, and that frequent vibration might cause a lamp or wire to become loose.

A witness for the defendant named Swanson, who had worked as an engineer at this institution for 14 or 15 years, described the elevator and its surroundings, and stated that he went through the main floor and basement every day, and that on December 23, 1932, the date of the accident, they were clean and that the floors were cleaned every day; that before the floors were cleaned, the timbers and walls were brushed with long handled brushes, and that the dust was swept from the floor to the floor sweeps, through which it was carried to the dust house; that there were seven floors to the elevator, and that there were two suction fans to remove the dust, one on the main floor, and one upstairs on the belt floor. Swanson also testified that he could not tell how frequently the walls of the building were brushed each year to free them from dust.

Another employee named Brazel testified in defendant's behalf, and to the effect that after the explosion, there was a lot of dust flying through the air; that he was through the building a week before the accident and that everything was clean, and that the floors were regularly cleaned. He also described the method of conveying the dust to the dust house. He stated that there was no machinery running in the building just before the explosion. Other witnesses for defendant described the general condition of the building, but their evidence is substantially the same as that already noted.

From the evidence, it is difficult to determine whether a fire caused the explosion, or the explosion caused the fire. The witness Garrity testified that he saw smoke and flame, and in a few seconds heard an explosion. Swanson, the engineer, stated that he heard a bell on the sprinkler system ring, and that almost immediately thereafter, the building was a mass of flames. Another witness testified to the same effect, and from all the testimony, we arrive at the conclu-

sion that there was a loud explosion, which was followed immediately by the fire which consumed the building.

Plaintiff's position is that the doctrine of *res ipsa loquitur* applied in the case, and that the burden was upon the defendant to rebut the presumption that its negligence caused the explosion and fire, which resulted in Duvall's death. Defendant, however, insists that even though the doctrine of *res ipsa loquitur* raises a presumption of negligence, it was clearly rebutted by the evidence in the case; also that the court was in error in instructing the jury, and that, therefore, the judgment should be reversed.

Defendant insists that the court erred in giving the following instructions offered by plaintiff:

"16. If you find, from the evidence, that Charlton Hunt Duvall was lawfully in the grain elevator of the defendant and that he was in the exercise of ordinary care for his safety, and that an explosion occurred in said elevator by reason of which the said Charlton Hunt Duvall was killed, and that the plaintiff and its employees were also in the exercise of ordinary care for the safety of Charlton Hunt Duvall, then the plaintiff has made out a prima facie case of negligence against the defendant, and this places upon the defendant the burden of rebutting that presumption by proving that the explosion could not have been prevented by the exercise of ordinary care.

"17. When it is said in these instructions that the plaintiff was required to exercise ordinary care for the safety of Charlton Hunt Duvall, it is meant that it was required to exercise that degree of care which an ordinary prudent person situated as the Charlton Hunt Duvall was before and at the time of the accident, would have exercised for his own safety."

The doctrine of *res ipsa loquitur* has been clearly stated by the Supreme Court in *Bollenbach v. Bloomenthal*, 341 Ill. 539, at page 547, as follows:

"The presumption raised by the doctrine of *res ipsa loquitur* does not require 'evidence to the contrary of equal weight' to overthrow it, for, . . . such presumption is not of itself evidence but arises as a rule of evidence and yields to any contrary proof. Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts, and as soon as any evidence is produced which is contrary to the presumption which arose before the contrary proof was offered, the presumption vanishes entirely. (*Osborne v. Osborne*, 325 Ill. 229; *Sielbeck v. Grothman*, 248 Ill. 435; *Lohr v. Barkmann Cartage Co.*, 335 Ill. 335; *Coal Creek Drainage District v. Sanitary District*, 336 Ill. 11.) In *Johnson v. Pendergast*, 308 Ill. 255, this court held: 'The existence of the *prima facie* case is provisional and does not change the burden of proof but only the burden of introducing further evidence. It means only that a determination of a fact shall be sufficient to justify a finding of a related fact in the absence of any evidence to the contrary. The only effect is to create the necessity of evidence to meet the *prima facie* case created, and which, if no proof to the contrary is offered, will prevail.' In no case has this court held that 'evidence to the contrary of equal weight' was necessary to overcome the presumption arising under the rule of *res ipsa loquitur*." In view of the character of the testimony before the jury, and of the holding of the Supreme Court in the case cited, the giving of instruction No. 16 on behalf of plaintiff, was error, for the reason that it placed upon the defendant the burden of proving itself not guilty, and that is not the law.

No question was raised as to whether or not plaintiff's employees, including Duvall, were in the exercise of care for their safety. The question before the jury was whether or not the evidence offered by the defendant was "contrary to the presumption which

arose before the contrary proof was offered.'' The burden of proof was not shifted from plaintiff to defendant upon the mere proof that the explosion and fire happened and the presumption that as a result Duvall met his death.

In *Barnes v. Danville Street Ry. & Light Co.*, 235 Ill. 566, the following instruction was given:

'' 'The court instructs the jury that the happening of an accident to the car and proof that an injury to a passenger resulted therefrom during the course of his transportation, and proof that at the time of the accident, and just prior thereto, the passenger was himself in the exercise of due care and caution for his own safety, raises a presumption that the carrier has been negligent. The burden of rebutting this presumption rests upon the carrier.' ''

In passing upon the instruction, the court said:

''If an injury to a passenger is caused by apparatus wholly under the control of the carrier and furnished and applied by it, or by some defect in machinery, cars or track, and the accident is of such a character as does not ordinarily occur if due care is used, the law comes to the aid of the plaintiff and raises a presumption of negligence. The presumption arises, however, from the nature of the accident and the circumstances and not from the mere fact of the accident itself. The rule laid down in the instruction that the mere happening of an accident to a car and the resulting injury of a passenger, with proof that the passenger was in the exercise of due care, raises a presumption that the carrier has been negligent, is too broad. (5 Cyc. 628; 5 Am. & Eng. Ency. of Law, — 2d ed. — 624.) ''

The judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded for a new trial.*

DENIS E. SULLIVAN, P. J., and HEBEL, J., concur.