Herbert Letush, Appellee, v. New York Central Railroad Company, Appellant.

Gen. No. 35,886.

Opinion filed October 4, 1932.

SIDNEY C. MURRAY, MARVIN A. JERSILD, and HAROLD E. CHRISTENSEN, for appellant.

IRVING G. ZAZOVE, for appellee.

Mr. Justice Gridley delivered the opinion of the court.

In an action of trespass on the case to recover damages for personal injuries, received by plaintiff early in the morning of September 1, 1929, while a passenger in one of defendant's eastbound fast trains, at the Village of Lakeview near and west of Buffalo, New York, there was a trial before a jury in January, 1932, resulting in a verdict finding defendant guilty and assessing plaintiff's damages at $3,000. Judgment was entered upon the verdict and defendant appealed. At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved for a directed verdict in its favor, but the motions were denied.

Plaintiff's declaration consisted of three counts. In the first he averred that on September 1, 1929, defendant was a common carrier of passengers and operated a certain train at or near Buffalo, New York, in which train plaintiff was a passenger; that while he was in the exercise of due care for his own safety, defendant negligently operated its train, in that it "failed and neglected to exercise the highest degree of care consistent with the practical prosecution of its business and operation of its road and mode of conveyance by it adopted"; and that as the proximate result of said negligence the train "was caused to and did . . . collide with great force with, upon and against another vehicle or object," thereby seriously and permanently injuring plaintiff, etc. In the second count the charge is the negligent failure "to have proper control over said train," so that it collided with "another vehicle or object." In the third count the charge is the negligent failure "to have a proper care and lookout," so that the train collided with "a certain vehicle or object." Defendant filed a plea of the general issue.

It was plaintiff's theory on the trial that, having proved that he was a passenger exercising due care

and that an accident had occurred, he was entitled to recover damages for his injuries. It was defendant's theory that it exercised its full duty in the operation of the train and that the accident was not caused by any negligence on its part. Defendant here so contends, and (a) that the trial court erred in refusing to grant its instructions for a directed verdict in its favor; (b) in refusing to admit certain evidence offered by it as to the distances within which the train could have been stopped at various rates of speed; and (c) in refusing certain instructions tendered by it relative to the speed of the train.

Plaintiff was his only occurrence witness. He testified in substance that, bound for New York City, he boarded the train at Chicago during the forenoon of August 31, 1929; that the train was due in Buffalo about 1:30 o'clock on the following morning; that he was not in a sleeping car but was seated in one of the coaches; that when the accident occurred the train was about 20 miles west of Buffalo and was traveling about "60 or 65 miles an hour"; that he was "snoozing" or "dozing" in his seat; that suddenly he "heard a violent crash and the window panes were broken"; that there was a "sudden jerk" and passengers "were moved from their seats"; that he was "thrown off his seat"; that "first, I fell forward across to the next seat in line and then back to the seat that I was sitting on"; and that he "don't know what caused the train to make the sudden stop" or "anything about the circumstances causing it to make the stop." He further testified that he received painful injuries "in the lower part of the back"; that he laid down on a seat and remained there until a relief train came and took him to Buffalo; that being unable to find a doctor he went in a cab to a drug store and had a plaster put on his back and took the next train to New York City, where he received medical treatment; that after his return to Chicago the pains in his back continued and

he was treated for several months by another physician; and that he still suffers from pains in his back.

Numerous occurrence witnesses, called by defendant, testified as to the accident. Among these were the engineer, fireman, conductor and head brakeman of train No. 41, westbound from Buffalo, and the engineer (John B. Newman), the conductor and a brakeman of train No. 10, eastbound, on which plaintiff was a passenger. Other witnesses testified for defendant. From all of defendant's witnesses the following uncontradicted facts in substance appear:

An unpaved road, about 30 feet wide, crossed defendant's four tracks at grade in the village or hamlet of Lakeview, New York. These tracks from north to south were known as Nos. 3, 1, 2 and 4. Nos. 1 and 2 were highspeed tracks,—No. 1 being used for westbound trains and No. 2 for eastbound trains. On both sides of the tracks there were automatic signal flashlights. Shortly after 1 o'clock on the morning of September 1, 1929, two fast passenger trains were approaching said crossing from opposite directions. Train No. 41, being en route from Buffalo to Cleveland, Ohio, was running westerly on track No. 1, and train No. 10, being en route from Chicago to New York City, was running easterly on track No. 2. Plaintiff was a passenger on train No. 10. Train No. 41 was traveling upgrade, at about 50 miles an hour. The engineer of that train was looking out ahead. The locomotive headlight was burning brightly and all equipment of the train was in good condition. Because of a slight curve in the tracks east of the crossing the headlight did not light up the crossing so as to enable the engineer to see it, or objects upon it and the tracks, until the train was a short distance from the crossing. The view of the approaching train, however, for one on or near the crossing, was unobstructed. The engineer sounded his whistle for the crossing at the whistling post,—about an eighth of a mile away, and

the automatic bell on the locomotive at all times was ringing. When about 80 feet from the crossing the engineer first saw an automobile partly on the track on which the train was running. It was not moving, and no one was in it, as was subsequently ascertained. The engineer applied the emergency brakes, reduced the speed of the train, but the automobile was struck and thrown over *on to track No. 2,* on which train No. 10 then was approaching. Train No. 41 was stopped within 3 or 4 car lengths. Immediately after it had stopped, the fireman, aware that train No. 10 was approaching and that the automobile was on its track, got off the locomotive with a lighted fusee and ran across the tracks to warn the engineer of train No. 10. This signal was not seen by him. At the same time the head brakeman on train No. 41, having seen the collision and being also aware of the approach of train No. 10, and that the automobile had been thrown over on track No. 2, took a red lantern and a white lantern, ran onto track No. 2, and signaled to the oncoming train, which signal was seen by said engineer when the train was about 100 feet away and running at a speed of 65 to 70 miles an hour. Its engineer had sounded his whistle for the crossing at the whistling post and the automatic bell on the locomotive at all times was ringing. The engineer had seen the approach of train No. 41 and had dimmed his headlight, as was customary. The brakes and other equipment on train No. 10 were in good working order. Immediately upon seeing the brakeman's signal with the red and white lanterns, and also seeing about the same instant ''an object on his track,'' the engineer of train No. 10 made an emergency application of the air brakes, but the locomotive struck the automobile and as a result his train *was derailed,* and track No. 2 so torn up that trains could not be moved thereon for a considerable time thereafter. Train No. 10, after striking the automobile, traveled about ''the train's length before it came to a

stop.'' On cross-examination of the engineer (Newman) of train No. 10, the abstract shows the following in part:

''Q. Now, going at the rate of 65 or 70 miles an hour, in the condition the track was that night, how long would it take you to stop your train after you had applied the brakes in such a way that it would not jar the train or the passengers? A. Do you mean after I knew I was going to stop?

''Q. Yes, that is it; in the case of an emergency. A. I stopped that night just as quick as it was possible.

''Q. Yes, but you jarred the train, didn't you? A. My object was to stop. .

''Q. I appreciate that. *There is nobody finding fault with you,* but that jarred your train pretty much, didn't it? A. Yes, sir.

''Q. And there was fire under each of the wheels when the brakes were applied? A. Oh, you see that lots of times when you make a service stop.

''If I were stopping my train and I was conscious of the fact that there were passengers in my train and didn't want to jar them, and if I applied all the mechanism I had on my train that night, under those conditions, to stop the train going at the rate of 65 or 70 miles an hour, I would start to brake under those conditions a whole lot further back than I did, but this thing was handed me *on the spur of the moment.* If I applied the brakes in the ordinary manner so that no passenger on the train, or the train, would be jarred, it would take me, maybe, a quarter of a mile or less. I knew, prior to that night, that it would take me that long, in my experience. . . . I wouldn't just say how far my *bright* light shows ahead of me, but, maybe, 500 or 600 feet, or more. *I cannot stop, going at the rate of 65 or 70 miles an hour, within 500 or 600 feet, without jarring my passengers.* . . . I knew, prior to that time, that Lakeview (crossing) was a public high-

way, a public crossing, and . . . the main artery, north and south of Lakeview.''

Three contentions here relied upon by plaintiff to sustain the verdict and judgment, as stated in his counsel's brief, are:

·''(1)  Plaintiff's evidence brings the case within the purview of the doctrine of *res ipsa loquitur,* which defendant could have overcome or rebutted by evidence showing it to be free from any negligence.

''(2)  Defendant's evidence, instead of rebutting or overcoming the *prima facie* case made out by plaintiff, conclusively shows it to have been guilty of negligence.

''(3)  There is evidence in the record sufficient to sustain every material allegation in plaintiff's declaration, and plaintiff's case does not depend alone on the theory of *res ipsa loquitur.*''

In 7 Words & Phrases Judicially Defined, p. 6137, it is said:

''The phrase *'res ipsa loquitur,'* which literally translated means that 'the thing speaks for itself,' is merely a short way of saying that the circumstances attendant upon an accident are, of themselves, of such a character as to justify a jury in *inferring* negligence as the cause of that accident, . . .''

In referring to the phrase and its meaning, it is said in 1 Thompson on Negligence, sec. 15:

''The meaning was thus expressed by Erle, J., in giving his judgment in a noted case: 'Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, *in the absence of explanation by the defendant* that the accident arose from want of care.' This definition has met with such general approval at the hands of judges in subsequent cases that it has become, so to speak, a legal classic.''

These definitions of the phrase are quoted with approval by the first division of this court in its opinion in *Pennsylvania Co. v. Roberts & Schaefer Co.*, 250 Ill. App. 330, where the court says (p. 339):

"But in the instant case there is no room to indulge in the *presumption* of negligence, because the evidence is clear as to how the accident occurred, and where there is specific evidence as to how the accident occurred, no *presumption* will be indulged."

In *Barnes v. Danville Street Railway & Light Co.*, 235 Ill. 566, 572-3, our Supreme Court says:

"The maxim *res ipsa loquitur* has a proper and legitimate application in actions for negligence, including an action against a carrier of passengers for an injury to a passenger, but the maxim does not apply upon mere proof that an accident to the passenger has happened. A carrier of passengers is not an insurer of their safety, and therefore liability does not arise from the mere happening of an accident; but the carrier is held to the exercise of the highest degree of care consistent with the mode of carriage and the practical operation of the business, and is liable for an injury resulting from such want of care."

In the case of *Western & Atlantic Railroad v. Henderson*, 279 U. S. 639, 642, 643, the court says:

"The mere fact of collision between a railway train and a vehicle at a highway crossing furnishes no basis for any inference as to whether the accident was caused by negligence of the railway company or of the traveler on the highway or of both or without fault of anyone."

After stating the doctrine of *res ipsa loquitur*, in *Bollenbach v. Bloomenthal*, 341 Ill. 539, our Supreme Court says (pp. 542, 543):

"The presumption or inference of negligence raised by the application of this doctrine is not absolute or conclusive but is rebuttable, and vanishes entirely when any evidence appears to the contrary. As is

said by this court in *Coal Creek Drainage District v. Sanitary District,* 336 Ill. 11, 31: 'A presumption is not evidence and cannot be treated as evidence. It cannot be weighed in the scale against evidence. Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered the presumption vanishes entirely.' "

In view of these definitions and authorities, and the evidence in the present case as above outlined, it is clear that the doctrine of *res ipsa loquitur* is not here applicable. Plaintiff, not knowing the facts and circumstances that caused the accident, only introduced evidence as to its effect upon him and as to the injuries he received as claimed. Defendant's evidence disclosed in detail how the accident happened and without negligence on its part or that of its servants, considering the mode of conveyance adopted and the practical operation of its railroad. When that evidence was introduced the *presumption* of negligence on its part, under said doctrine, "vanished entirely." And there is another reason why the doctrine is not here applicable and that is because it clearly appears that the automobile, with which train No. 10 collided, causing the train's derailment, was not under defendant's control. In *Chicago City Ry. Co. v. Rood,* 163 Ill. 477, it is held in substance that the fact that a passenger on a street car, while exercising due care, is struck and injured by a passing wagon not under the street car company's control, does not, of itself, raise a presumption of negligence against the company. (See, also, *Chicago Union Traction Co. v. Mee,* 218 Ill. 9, 14, 15.) In *Loehner v. North Chicago Street R. Co.,* 116 Ill. App. 365, where a passenger on a street car was injured when a coal wagon not under the control of the company skidded and struck the car, the

trial court at the close of plaintiff's evidence directed a verdict against plaintiff and entered a judgment against him. On the appeal he urged in substance that he was entitled to have had a jury pass upon his case because of the doctrine of *res ipsa loquitur,* but the court held to the contrary and affirmed the judgment, saying (p. 367): "Where the proximate cause of the injury, at least in part, was the act of a third person over whom the carrier had no control, the presumption of negligence from the happening of the accident does not arise, but the duty of proving the negligence of the carrier rests upon the passenger." In the recent case of *Wilson v. Colonial Air Transport,* 180 N. E. 212, decided by the Supreme Court of Massachusetts in March, 1932, the court says (p. 214):

"The principal of *res ipsa loquitur* only applies where the direct cause of the accident and so much of the surrounding circumstances as were essential to its occurrence were within the sole control of the defendants or their servants. . . . It is to be noted that the presumption raised in favor of the plaintiff by the application of the *res ipsa loquitur* doctrine is one of evidence and not of substance, and that the burden of proof remains during the trial upon the plaintiff."

As to the contention of plaintiff's counsel, in substance that *defendant's* evidence sufficiently shows that it was guilty of the negligence charged in each and every count of the declaration, and that the judgment appealed from should be affirmed, we are of the contrary opinion, after carefully considering the evidence and the authorities. The negligence charged in the declaration is defendant's failure (1) "to exercise the highest degree of care consistent with the practical prosecution of its business and operation of its road and mode of conveyance by it adopted"; (2) "to have proper control over said train," and (3) "to have a proper care and lookout." It is not specifically charged in the declaration that defendant

negligently ran its train, on which plaintiff was a passenger, at an excessive or unlawful rate of speed, but it here is contended that it did. We do not find in the record any evidence that the engineer of train No. 10, Newman, failed to have a "proper control" of the train, or failed to keep a "proper lookout." He saw train No. 41 approaching on the other track and afterwards the brakeman's signals with the white and red lanterns, and the "object" on the track, which had been there but for a very short time. He at once applied his emergency brakes and endeavored to stop his train as soon as he could, and stopped it within about the train's length. In *Chicago Union Traction Co. v. Browdy,* 206 Ill. 615, 618, it is said: "The law seems to be well settled that where the alleged negligence of a servant consists of an omission of duty suddenly and unexpectedly arising, it is incumbent on the plaintiff to show that the circumstances were such that the servant of defendant had an opportunity to become conscious of the facts giving rise to the duty, and a reasonable opportunity to perform it, before the master can be held liable." There is no evidence in this record showing that the engineer, Newman, should have seen the signals or object on his track, or should or could have stopped his train, before he did. Furthermore, the law does not require of a common carrier "unreasonable or impracticable vigilance." (*Frink v. Potter,* 17 Ill. 406, 412; *Grubczak v. Chicago Rys. Co.,* 242 Ill. App. 384, 388.)

The contention of the excessive speed of the train (65 or 70 miles an hour) may be considered with that of the alleged negligence charged in the first count, viz., the failure "to exercise the highest degree of care consistent with the practical prosecution of its business," etc. To operate passenger trains so as to travel rapidly is one of the great utilities of the railroad system. There is no evidence in the record showing that a speed of 70 miles an hour of a railroad train in

the open country is excessive or unlawful, or of any statutory or municipal regulation limiting the speed of railroad trains in the locality where train No. 10 then was running. (*Urban v. Pere Marquette R. Co.*, 266 Ill. App. 152, 161.) Nor does the evidence show that such speed was the proximate cause of the accident, nor that if the speed had been less the accident would not have occurred. In *North Chicago Street R. Co. v. O'Donnell*, 115 Ill. App. 110, 114, it is said: ''The burden is upon the plaintiff of making good the charge of negligence against appellee. It is said in *Pfeiffer v. Chicago City Ry. Co.*, 96 Ill. App. 10, 12, 'The extreme precaution of running cars so cautiously as to avoid the unusual or extraordinary, of which there is not notice, would prevent the practical operation of the road and is not required.' '' In *Childs v. Pennsylvania R. Co.*, 150 Pa. 73, it was held that a rate of speed of 53 miles an hour at a crossing in a rural portion of a city did not give rise to a finding of negligence, the court saying (pp. 76, 77): ''The right of a railroad to move its trains at such a rate as the necessities of its business, or the requirements of the public may make necessary, is subject only to such restrictions as may be found necessary in cities and populous towns. . . . The movement of trains must be regulated by the railroad companies in the exercise of a business discretion, and upon consideration of the competition they have to encounter and the necessities of modern business. We do not think a jury may fix the maximum rate of speed at which a train shall be moved in the open country, or that a high rate of speed is negligence *per se.*'' In *Pennsylvania R. Co. v. Stegaman*, 22 F. (2d) 69, the U. S. Circuit Court of Appeals for the 6th circuit, quoting from an opinion of the Supreme Court of Ohio, said (pp. 70, 71): ''As there are road crossings in the country every few miles, it is inconsistent with proper speed of transportation that trains should slack up for such crossings. Safety

is secured to persons at such crossings by the observance of the statutory signals, and, such signals being given, the train is not limited as to speed." In *Graham v. Hagmann*, 270 Ill. 252, 258, our Supreme Court said: "Railroads are engaged in the performance of a business of a *quasi* public nature, and in carrying out the purposes for which they are created must necessarily often operate their trains at such a high rate of speed that they cannot be brought to a sudden stop without endangering the lives and safety of those riding therein."

Our conclusion is that under the pleadings and the undisputed evidence the trial court erred as a matter of law in not granting defendant's motion made at the close of all the evidence for a directed verdict in its favor, and, after the verdict for plaintiff was returned, in entering the judgment appealed from against defendant. In view of such holding it is unnecessary for us to consider defendant's other contentions, (b) and (c), above mentioned. Accordingly, the judgment is reversed and the cause will not be remanded.

*Reversed.*

KERNER, P. J., and SCANLAN, J., concur.