Henry W. Herbst, Administrator of the Estate of
Edward W. Herbst, Deceased, Appellee, v. J.
Arthur Levy, Appellant.

Gen. No. 37,517.

354

Opinion filed March 29, 1935.

Joseph H. Hinshaw, of Chicago, for appellant; Oswell G. Treadway, of Chicago, of counsel.

Bowe & Bowe, of Chicago, for appellee; Augustine J. Bowe and John D. Casey, of Chicago, of counsel.

Mr. Presiding Justice Friend delivered the opinion of the court.

Henry W. Herbst, administrator of the estate of Edward W. Herbst, deceased, brought an action

against defendant under the Injuries Act, Cahill's St. ch. 70, on behalf of the widow and daughter of plaintiff's intestate to recover damages for the alleged wrongful death of plaintiff's intestate. Trial was had before a jury, resulting in a verdict and judgment for $8,500, from which defendant appeals.

Counts 2 and 3 of the declaration were dismissed and withdrawn, leaving only count 1, which alleged the negligence of defendant and that plaintiff's intestate was in the exercise of proper care and caution for his own safety at the time of the accident. Defendant interposed a plea of the general issue and an additional plea averring that the widow and daughter of deceased had brought suit before the industrial commission of Illinois, under the Workmen's Compensation Act, Cahill's St. ch. 48, ¶ 201 *et seq.*, alleging that deceased was employed under said act and that the accident arose out of and in the course of his employment, which it is averred barred plaintiff's action.

The circumstances of the case are most unusual. The facts, as to which there is substantially no dispute, disclose that defendant was the owner of a 6-passenger Dodge motor boat, which he operated on Fox Lake and adjacent waters and kept at Larson's boathouse, located a short distance from the village of Fox Lake, Illinois.

Early in the afternoon of August 5, 1931, Edward W. Herbst, the deceased, and A. C. Ehlers, employees of the North West Buick Company, of which defendant was vice president, drove from Chicago to Larson's boathouse by automobile for the purpose of doing some work on the boat. Later in the afternoon, Carl K. Kenderdine and one Herman Gruneberg arrived at the boathouse. The deceased and Ehlers were still working on the boat. They then took a trip around the lake, returning in about 30 minutes. The

work on the boat was finished, and Kenderdine invited the others to his summer cottage across the lake for dinner. The deceased, Ehlers, Kenderdine, Gruneberg and defendant, all got into the boat and proceeded through the channel into Nippersink Lake, across another channel and over Fox Lake to Kenderdine's home, where all had dinner except defendant who went to his own home nearby.

After defendant had his dinner he drove his boat around the lake for some 30 or 40 minutes. About 8:30, just before dusk, defendant drove back to Kenderdine's home for the purpose of taking the deceased and Ehlers back to the boathouse, where their automobile was parked, in order that they might return to Chicago. The same five men, and also Elmer Jung, making six in all, got into the boat and started for Larson's landing. Defendant was driving, seated on the left-hand side of the front seat. Next to him was Gruneberg. Kenderdine was sitting on the deck, facing forward with his feet hanging between defendant and Gruneberg. Ehlers and Jung were sitting on top of the cockpit, and deceased was standing in the rear of the cockpit, about the middle of the boat, with his elbow leaning on the windshield, facing forward.

The boat was traveling at a speed of between 1,800 and 1,900 revolutions a minute, which was equivalent to 12 or 15 miles an hour. It had crossed to the west end of Fox Lake, and was making a slight turn to the right, following the channel. For some reason which is not explained by the evidence the boat seemed to raise up in the water, then level down, and turn over to the left, throwing the occupants into the water. The steering wheel pulled defendant under the overturned boat. When he extricated himself and came up to the surface, four of the men had already come up but plaintiff's intestate could not be found. They called his name, searched under the boat, dove around

in order to find him, but could not. The boat sank, leaving the men out in the lake. Deceased's body was recovered the next morning.

The boat had been purchased new a little over a year before, and was in good running order at the time. It had an 8-cylinder engine, capable of 3,200 r. p. m., which according to the evidence was equivalent to a speed of about 35 miles an hour. Defendant was familiar with its operation, had driven it over this route many times at various speeds, and it had never before capsized. It was equipped with regulation marine lights and life preservers. The surface of the lake was calm, the water clear, and no objects were observed floating on the surface of the water at the place of the accident.

There is evidence to the. effect that prior to the accident there had been observed pier posts floating in the water and weed pods, consisting of large masses of sea weeds, floating just at the surface. On several occasions some of these weed pods had been encountered which clogged the propeller, and made it necessary to stop and reverse the boat in order to clear the propeller of these weeds. When the boat was raised the following day, the steering mechanism appeared to be intact and there were but a few scratches in the varnish on the bottom of the boat.

Of the five surviving occupants of the boat, only two were called as witnesses. Defendant, called as a witness on behalf of plaintiff, testified in substance that the boat was in good running order; that he was driving along at about 12 to 15 miles an hour, with both hands on the wheel, looking forward, and that very little conversation ensued; that immediately preceding the accident the boat was proceeding along without any change of speed and following the course of the channel slightly to the right, when the boat seemed to rise suddenly, turn to the left and then capsize; and

358

that he observed no objects floating upon the water immediately before the accident.

Fred Ludolph, another witness called on behalf of plaintiff, testified that he was engaged in building, selling and repairing boats and motors, and was familiar with this particular type of boat. He described the mechanism of the motor, ignition, clutch, propeller and steering apparatus, and their various functions. In the course of his examination, several hypothetical questions were propounded, which he was permitted to answer. He testified that in his opinion an obstruction sufficient to overturn a boat would cause a mark or dent to appear on the bottom part of the boat or the mechanism on the underside of the boat,—the propeller or rudder, also that the striking of an object sufficiently strong to overturn a boat would cause a jar or shock which could be definitely felt by the occupants of the boat; and that a boat of this type, operating at from 1,800 to 1,900 r. p. m., turning slightly to the right at the time, could not be overturned by sea weeds in the water. He was then given a hypothetical question containing some of the facts in evidence relating to the speed of the boat, the number of passengers, the condition of the water, and other circumstances, and asked whether he could determine with reasonable scientific certainty the cause of the capsizing of the boat. After numerous objections made by counsel for defendant, he was permitted to testify that the accident might have occurred by reason of the sudden closing of the throttle, shifting the weight, and lowering both sides of the boat. These elements, however, were not included in the hypothetical question, and there was no evidence from which the jury could fairly find that any of these processes took place by reason of anything that defendant did in operating the boat. In fact, defendant

stated positively that he did not close the throttle or either increase or decrease the speed of the boat, immediately preceding the accident. While there is some evidence to show that the throttle was closed when the boat was taken from the water the following day, it is entirely possible that this may have occurred when defendant, who was caught behind the steering wheel when the boat capsized, struggled to extricate himself from his position.

Fred Bairstow, a resident of that region, testified on behalf of plaintiff that he was familiar with the lake at the point of the accident; that the water was some 15 feet in depth; that there was no particular flow in any direction at that point, and that the weeds growing in that particular part of the lake were then only two or three feet high, leaving clear water below the surface for approximately 10 or 12 feet.

K. K. Kenderdine was the only witness produced on behalf of defendant, and testified substantially to the same facts as the defendant with reference to the speed of the boat, the condition of the water, the arrangement of passengers, the absence of particles floating on the surface, and added that "the boat acted very peculiarly just ahead of the accident,—a couple of seconds before the accident,—and it seemed to sort of level out a bit. I cannot exactly describe what it was, but there was a peculiar action just a second or two before the accident occurred, and when the accident occurred the boat listed over to the left and forced me, oh, maybe about 8 or 10 feet. From the time I first sensed something going wrong until I was in the water was not over two or three seconds. I could see what Mr. Levy was doing. He was right at my left. He was driving the boat. He was looking ahead, as I recall. There wasn't any particular conversation going on at this particular time."

The foregoing evidence, substantially all that was introduced as to the circumstances immediately preceding the accident, utterly fails to disclose the cause of the capsizing of the boat. It was not seriously contended by plaintiff upon the trial, nor does he urge in his brief, that defendant was negligent in driving the motor boat at 12 to 15 miles an hour in the dark over these waters. The facts disclose that the boat was equipped with lights and other required safety devices. If deceased, who from a standing position in the middle of the boat, was able to observe the speed of the boat and the course taken, and the condition of the waters at that point, sensed any danger, it was his duty, in the exercise of ordinary care and caution for his own safety, to call defendant's attention thereto. The sole charge in the declaration is the negligence of defendant, and it was incumbent upon plaintiff to prove negligence. From a careful examination of the record we fail to find any competent evidence of negligence that could properly have been submitted to the jury. In fact, the court seemed to entertain considerable doubt, at the close of plaintiff's case, whether a cause of action had been established. When defendant's counsel, in making the motion for a directed verdict, stated to the court "I cannot see any evidence upon which the court could allow this thing to go to the jury," the court replied: "There is considerable merit in what you say. I think under the old practice I would be forced to make a ruling on it. . . . The new practice act seems to contemplate this case going to the jury, so, if the court is in error in granting or refusing to allow this motion, the appellate court can correct it without a retrial of the case. . . . I appreciate that the evidence is very circumstantial, there isn't any clear proof that the defendant acted in a negligent manner. On the other hand, I also appreciate the happening of such an event." The

court evidently had reference to section 68 of the Civil Practice Act (subsection 3-a, ¶ 196, ch. 110, Cahill's 1933 Revised Statutes), which permits the trial judge to reserve his ruling on motions for a directed verdict until after the entry of a verdict, but this section of the statute does not in any way alter the rule of law which requires the court to direct a verdict in favor of defendant where plaintiff has failed to adduce some evidence of negligence when negligence is charged.

In the argument employed by plaintiff under point one of his brief, seeking to show that negligence was established, his counsel states that "the case clearly falls within the rule known as *res ipsa loquitur*," and his argument to the jury was based principally upon this theory of the case. To the extent that this doctrine may be invoked as a substitute for specific proof of negligence, it is a variance from, or exception to, the general rule that negligence must be specifically alleged and proved. The reason for the rule rests upon the presumption that in view of the surrounding circumstances the accident would not have happened had the defendant used ordinary care, and the injury itself will be deemed to afford prima facie evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. However, the presumption raised by the doctrine does not require evidence to the contrary of equal weight to overthrow it, for such presumption is not of itself evidence but raises a rule of evidence and yields to any contrary proof. Therefore, when the surrounding circumstances leave room for a different presumption, the reason for the rule fails. (*Bollenbach v. Bloomenthal*, 341 Ill. 539; *McGowan v. Nelson*, 36 Mont. 67.) In the case at bar, defendant having been called as a witness on behalf of plaintiff, proved by his own tes-

timony and that of Kenderdine, the only two eyewitnesses testifying, that defendant was not guilty of any act or omission which caused the boat to capsize, and that he was driving with due care and caution. This evidence served to overcome the presumption which arose before the contrary proof was offered, and, as was said in *Bollenbach v. Bloomenthal, supra,* "the presumption vanishes entirely."

In well considered cases resting upon the application of this doctrine as tending to establish prima facie evidence, and where liability was upheld, it will be found that in every instance there was an essential element present, namely, proof of the existence of the cause or thing which was alleged to have been the negligent act that produced the injury, or proof of such facts from which the existence of such cause or thing constituting the alleged negligent act was the only reasonable inference that could be properly drawn. (*Conover v. Delaware, L. & W. R. Co.,* 92 N. J. L. 602.) Thus, in *Benedick v. Potts,* 88 Md. 52, 41 L. R. A. 478, plaintiff was riding as a passenger in a roller coaster conducted in an amusement park by the defendant, and he was picked up in an unconscious condition in one of the tunnels through which the roller coaster had passed, with a wound or bruise on his forehead, but there was no evidence of any agency which might or could have caused the injury. The court so held and in the course of its opinion said:

"The maxim does not go to the extent of implying that you may, from the mere fact of an injury, infer what physical act produced that injury, but it means that when the physical act has been shown, or is apparent, and is not explained by the defendant, the conclusion that negligence superinduced it may be drawn, as a legitimate deduction of fact. It permits an inference that the known act which produced the injury was

a negligent act, but it does not permit an inference as to what act did produce the injury."

In *Slack v. Harris,* 200 Ill. 96, one of the cases cited in plaintiff's brief, an engineer had gone to a small room at the top of the elevator shaft shortly before the accident, for the purpose of repairing the elevator and to adjust the apparatus, and took with him a monkey wrench. While there he called to the elevator man, asking him to run the car up and down while the adjustment was being made. The car rose so rapidly that the operator was unable to control it and it struck the roof, injuring the operator who brought suit against the owner of the building to recover damages. Plaintiff contended that the engineer loosened certain nuts in the elevator machinery while the car was being run up and down the shaft, causing the elevator to become uncontrollable. After the accident it was found that certain nuts were loose, and expert machinists testified that the accident could have been caused by the loosening of the nuts. There was no direct evidence, however, to show that the engineer did loosen the nuts, and in testifying he denied having done so. It thus became a question of fact for the jury to determine whether the only explanation offered for the cause of the injury was a negligent act, and at least some plausible ground was offered for the cause of the injury without indulging in any inferences as to what act produced it.

In the case at bar, the cause of the capsizing of the boat is, under the state of the record, left entirely to speculation and conjecture, and under these circumstances the doctrine of *res ipsa loquitur* cannot be applied.

To permit recovery under this rule in the instant case, plaintiff would also be required to prove that defendant was in possession and control of the instru-

mentalities by which the accident was brought about, and that the accident was of such a nature that it could not reasonably be expected to have happened if defendant was not negligent in the control of such instrumentalities. (*Barnes v. Danville Street Ry. & Light Co.*, 235 Ill. 566; *Chicago City Ry. Co. v. Rood*, 163 Ill. 477; and *Letush v. New York Cent. R. Co.*, 267 Ill. App. 526.) While it is true that defendant was in possession and control of the motor boat, he did not have control of the water in which the boat was being driven, of the objects or particles that might have been therein, nor of the currents of the lake. He might have avoided obstructions on the surface of the water, but if there were any submerged or that could not be seen, he was in no better position to discover them than was the deceased himself.

Various other ground is urged by defendant for reversal, but in view of our conclusion that no negligence was shown and that the doctrine of *res ipsa loquitur* is not applicable, we deem it unnecessary to consider other points. In our opinion there was no evidence of negligence that could fairly have been submitted to the jury, and therefore the trial court should have allowed the motion of defendant for a directed verdict at the close of plaintiff's case.

For the reasons stated the judgment of the trial court will be reversed without remanding.

*Reversed and judgment here for defendant.*

SCANLAN and SULLIVAN, JJ., concur.